IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ED DAIE,<br><br>Plaintiff,<br><br>v.<br><br>INTEL CORPORATION LONG TERM DISABILITY PLAN, INTEL CORPORATION, THE REED GROUP, LTD., and CLAIM APPEAL FIDUCIARY SERVICES, INC., and DOES 1–50,<br><br>Defendants. | No. C 15-05255 WHA<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this action seeking long-term disability benefits pursuant to a plan governed by the Employee Retirement Income Security Act of 1974, both sides move for summary judgment. To the extent stated below, defendants' motion is **GRANTED**, and plaintiff's motion is **DENIED**.

**STATEMENT**

Plaintiff Ed Daie, a fifty-eight year old man, worked for defendant Intel Corporation for twenty-seven years. He most recently worked as the server memory and security technology director, a sedentary but intellectually demanding position. Daie took an unpaid leave of absence beginning in September 2012. He participated in the Intel Corporation Long Term

Disability Plan, which was governed by the Employee Retirement Income Security Act of 1974 (the "Plan") and fully funded by Intel (Plan Doc. at 1–40).[1]

The Plan generally paid sixty-five percent of a participant's monthly earnings if that participant proved he had a qualifying "Disability," which the Plan defined as "illness or injury that renders a Participant incapable of performing work. Both the illness or injury, and the inability to perform work, must be substantiated by Objective Medical Findings" (Plan Doc. at 3).

The Plan defined an "Objective Medical Finding" as follows (Plan Doc. at 5–6):

> A measurable, independently-observable abnormality which is evidenced by one or more standard medical diagnostic procedures including laboratory tests, physical examination findings, X-rays, MRI's, EEG's, ECG's, "Catscans" or similar tests that support the presence of a disability or indicate a functional limitation. Not all tests or test results meet the criteria of Objective Medical Findings. For example, tests that depend on Participant self-reports, such as trigger point/tender point tests, are not considered objective and do not establish eligibility for benefits under this Plan. . . . Objective Medial Findings do not include physicians' opinions or other third party opinions based on the acceptance of subjective complaints (*e.g.*, headache, fatigue, pain, nausea), age, transportation, local labor market and other non-medical factors. To be considered an abnormality, the test result must be clearly recognizable as out of the range of normal for a healthy population. The significance of the abnormality must be understood and accepted by the medical community as diagnostic of the specific disabling condition asserted by the Participant.

The Plan offered two periods of long-term disability benefits. In the first eighteen months of a claimed disability, a participant was entitled to benefits if his disability prevented him from working at his "own occupation." Beginning in the nineteenth month, a participant was entitled to benefits only if his disability prevented him from working in "any occupation" (Plan Doc. at 3).

The Plan delegated discretionary authority for claims handling in the first instance and first-level appeals to defendant The Reed Group, Ltd., and it delegated responsibility for final appeals to defendant Claim Appeal Fiduciary Services, Inc. (Plan Doc. at 19, 38).

---

[1] Citations to "Plan Doc. at X" are to the Plan's governing document (Dkt. No. 47). Citations to "AR at X" are to the Administrative Record (Dkt. Nos. 39–45).

Daie took a leave of absence from his position beginning in September 2012. He told a consulting psychiatrist he was going on a one-month leave of absence due to scheduled sinus surgery, but he also stated he did not think he would return to work because he felt he was "being gradually managed out of his position as part of a restructuring of the company" (AR at 806).

Daie applied for short-term disability benefits through an unrelated plan offered by Intel. Daie's application for short-term benefits won approval and terminated a year later in September 2013 — the maximum period available under the short-term plan. Unlike the long-term plan, Intel's short-term plan did not require members to provide objective medical findings to support a claim.

Daie applied for Social Security benefits and for benefits from a private disability insurance policy from Metlife, Inc. Both applications were granted (AR at 243, 1682, 1858).

Daie then applied for long-term benefits under the Intel Plan. In support of his claim, Daie submitted extensive medical records from numerous physicians who have treated him for eleven different conditions in three categories: upper respiratory conditions (chronic acute sinusitis, allergic rhinitis, severe asthma, and sleep apnea), psychiatric conditions (major depressive disorder, episodic mood disorder, and generalized anxiety disorder), and musculoskeletal conditions (meralgia paresthetica, lumbar spondylosis, and avascular necrosis) (AR at 489).[2]

### 1. DAIE'S MEDICAL CONDITIONS.

#### A. Upper Respiratory Conditions.

To the Plan, Daie submitted evidence that he suffered from severe asthma, allergic rhinitis, chronic acute sinusitis, and sleep apnea, conditions that interfered with Daie's breathing and caused allergy-related symptoms. Numerous records indicated that he had smoked cigars since 1980 and continued to do so despite instructions from his physicians to stop (AR at 1488, 1595–96, 1602).

---

[2] Daie also submitted records of a diagnosis of a gastrointestinal condition — pelvic floor dyssynergia — but he does not address that condition as a basis for his motion.

3

1    Test results indicated that Daie had limited lung capacity and that he underwent eight
2    reconstructive sinus surgeries to correct his conditions, but the treatment was not effective.
3    Daie took numerous medications, including the steroid Prednisone, to treat his conditions, and
4    he carried an epi-pen in case of emergency. He informed one psychiatrist, Dr. Robert Bright,
5    that he had a number of life-threatening asthma attacks (AR at 1193, 2379).

6    On September 27, 2012, Daie underwent sinus surgery, performed by Dr. John Raines.
7    Prior to that surgery, his primary care physician, Dr. Richard Settles, wrote an attending
8    physician statement in support of Daie's claim for *short-term* benefits, noting the scheduled
9    surgery and stating that Daie "will be unable to work at all after 9/27/2012" (AR at 1733).
10   Following the surgery, Surgeon Raines released Daie to return to work on October 11, 2012
11   (AR at 1721–22). On November 14, however, Physician Settles wrote an additional statement
12   in support of Daie's application for benefits from Metlife listing numerous conditions, and
13   indicating "patient is unable to work at all . . . patient has had all of these conditions rapidly
14   come on and is totally unable to work at this time" (AR at 2165–66).

15   In February 2013, after a sleep study, Dr. Phillip Lyng diagnosed Daie with moderate
16   "obstructive sleep apnea and severe upper air way resistance" (AR at 1805). Sleep-Study
17   Physician Lyng instructed Daie to wear a continuous positive air pressure ("CPAP") machine
18   while he sleeps; however, Daie claimed he could not sleep while using the CPAP machine,
19   which he attributed to his asthma and sinus problems (AR at 1194). Sleep-Study Physician
20   Lyng informed Daie that acclimation to the CPAP machine would take some time and that he
21   might need to go through several different masks (AR at 1184). Daie visited a sleep center,
22   where he tried several different masks (AR at 2242–44). The record does not indicate the status
23   of Daie's efforts with various sleep apnea treatments.

24   **B.    Psychiatric Conditions.**

25   Daie provided records of psychiatric conditions, which he attributed in part to side
26   effects from his allergy medications, particularly the Prednisone. Two psychiatric emergencies
27   required him to be admitted to the hospital in 2007. Daie's psychiatrist, Dr. Leanne Kelley,
28   diagnosed him with a mood disorder and generalized anxiety disorder. Psychiatrist Kelley

4

stated that Daie "[s]hould not engage in usual work activities — failure to perform adequately would worsen his anxiety and depression. Poor concentration, fatigue, mood swings limit all work functions. Analytical skills are particularly impacted by depression, anxiety, medication side effects." Psychiatrist Kelley made her diagnoses based only on "reported symptoms." She provided no response when asked whether she had made any objective physical findings (AR at 1737–38).

Daie also submitted records from his ear, nose, and throat specialist, Dr. Stephen Graham who opined about Daie's cognitive conditions. In a statement written in March 2013, ENT Physician Graham indicated that Daie suffered from "inability to remain awake, think clearly, and speak while on necessary medication," but estimated Daie could return to work by June 2013 (AR at 1716). A later statement, written in June 2013 indicated Daie was "unable to work within his profession due to cognitive issues" and described that disability as "likely permanent" (AR at 1503). ENT Physician Graham did not attribute any disability to Daie's sinus conditions.[3]

### C. Musculoskeletal Conditions.

Daie submitted records from Dr. Ibrahim Aksoy, including EMGs, x-rays, and MRIs. The records indicated that Daie suffered from several musculoskeletal conditions that caused severe chronic pain throughout his lower back, thighs, and hip (AR at 1201, 2403, 2495). In May 2012, at his only visit with Pauline Lucas, a physical therapist, Daie stated that he rated the pain a two out of ten during the visit, though he said it reached an eight out of ten "at worst" (AR at 2405). Musculoskeletal Physician Aksoy's records from a visit in April 2012 indicated that Daie reported a range of intensity from "1 to 8 out of 10" and that he reported "4/10 pain" which he described as "an average day" (AR at 1556). The following month, Musculoskeletal

---

[3] Defendants describe these statements from ENT Physician Graham out of sequence, leaving the impression that his final opinion was that Daie could return to work in June 2013.

5

1 Physician Aksoy indicated that Daie reported "pain ranging in intensity from 2 to 3 out of 10"
2 (*ibid.*).[4]

3 Per Musculoskeletal Physician Aksoy's recommendation, Daie went to another physical
4 therapist in November 2012, Susan Meland, who wrote in a report that "his pain level on [that]
5 date [was] noted to be 4 out of 10. He note[d] at the worst, in the last week is [sic] was 6 to 7
6 out of 10" (AR at 814). Daie attended a total of seven physical therapy sessions, but the
7 sessions did not help (AR at 1564).

8 In February 2013, Musculoskeletal Physician Aksoy noted that Daie's pain intensity
9 "range[d] from 0 to 8 out of 10" (*ibid.*). In March 2013, Daie received an injection, which he
10 later reported to Musculoskeletal Physician Aksoy "resolved his back pain." Nevertheless,
11 following the injection, Daie reported that his overall pain intensity was "worse than before"
12 (AR at 816).[5]

13 **2.    DEFENDANTS' EVALUATION OF DAIE'S CLAIMS.**

14 **A.    Initial Review and First-Level Appeal by Reed.**

15 Reed evaluated Daie's claim in the first instance and asked five independent physicians
16 to review plaintiff's medical history. All five concluded that Daie's medical records failed to
17 show he suffered from a Disability as defined by Intel's Plan, which provided that "[b]oth the
18 illness or injury, and the inability to perform work, must be substantiated by Objective Medical
19 Findings" (Plan Doc. at 3). All concluded that Daie's records lacked Objective Medical
20 Findings as defined by the plan to support his claimed inability to work.

21                *(1)    Dr. Sonne (Internist).*

22 Dr. Leonard Sonne, an internal medicine physician, reviewed Daie's pulmonary and
23 sleep issues. He noted that "patients with severe asthma do not smoke" since smoking triggers
24 asthma. Reviewing Internist Sonne further noted that Daie appeared to be managing his
25 treatment for his respiratory conditions poorly, but even so there had been no record of frequent

26 ───────────────

27 [4] In his brief, Daie states his pain "rises to a level of 8 on a scale of 10 each day" (Pl.'s Mtn. at 9 (citing AR at 2405)). Daie's description of his daily pain levels in his brief is a clear exaggeration of the record.

28 [5] Defendants cite Daie's report that the injection resolved his back pain but entirely ignore the report of exacerbated pain, even though the statements appear in the very same paragraph.

6

1  exacerbations requiring hospitalization. Moreover, several exams showed that Daie had a clear
2  chest and normal oxygen saturation. Reviewing Internist Sonne opined that "[a]t the time
3  [Daie] stopped working, asthma was not the issue — the main issue appeared to be about stress
4  at work" (AR at 203–04).

5  Reviewing Internist Sonne further opined that several treatments remained available for
6  Daie's sleep apnea but that Daie had declined those treatments. Thus, he concluded that Daie's
7  records showed no objective documentation of any work restrictions or limitations based on his
8  pulmonary and sleep conditions (AR at 205).

### (2) Dr. Kaplan (Musculoskeletal Physician).

Dr. Richard Kaplan, who specialized in physical medicine, rehabilitation, and pain management opined that records of Daie's musculoskeletal conditions were inconsistent with objective evidence of disability, and showed good objective function. He stated that the Objective Medical Findings suggested that restricting Daie's physical activities would be *contraindicated*, and that his usual work activities could be therapeutic (AR at 245, 813, 823, 827–29).

Reviewing Musculoskeletal Physician Kaplan also found that there had been no indication that any physician had restricted Daie from driving, which would have been required if his medications had caused disabling cognitive impairment. He also noted that neuropsychological and neuropsychometric testing would have been appropriate if any provider had felt Daie suffered from such symptoms, though Daie's examining psychiatrists never ordered such tests. Indeed, Daie's neurological exams turned up normal. Finally, no physician had attempted titration of Daie's medications in order to limit side effects (AR at 246).

### (3) Dr. Gupta (Allergist).

Dr. Payel Gupta, an allergy specialist, reviewed the records. Reviewing Allergist Gupta particularly noted Daie's low lung capacity but found Daie's asthma appeared to have stabilized. This finding was despite the fact that several physicians noted Daie failed to take his asthma medication regularly (AR at 185–87).

7

*(4)     Dr. Moss (Psychiatrist).*

Dr. Fred Moss evaluated Daie's medical file from a psychiatric perspective and concluded that there had been no abnormal behavioral findings or abnormal mental status findings. Although Daie had self-reported irritability and depression, among other psychiatric conditions to certain doctors, Reviewing Psychiatrist Moss found that other providers described Daie as "awake, alert and cognitively intact." He particularly noted that Daie had discontinued his own medication due to his personal assessment of the side effects (AR at 216–29).

*(5)     Dr. Altman (Gastroenterologist).*

Dr. Alan Altman evaluated Daie's medical file from a gastroenterology perspective (AR at 500–22). He reviewed several components of an extensive study, none of which indicated that his gastrointestinal conditions impaired his ability to work. Reviewing Gastroenterologist Altman stated that Daie's conditions were common among the full-time workforce. He also noted that several of Daie's treating physicians had generally reported Daie's noncompliance with medication regimens (AR at 848, 861, 888, 1572).

*                    *                    *

In September 2013, Reed sent an eleven-page letter to Daie, informing him that his claim for long-term benefits had been denied. The letter identified which records had been reviewed and identified what conditions had been documented, but concluded that there were no Objective Medical Findings to support Daie's inability to work. The letter acknowledged Daie's parallel application for Social Security benefits and differentiated the Plan on the basis of its definition of Objective Medical Findings. The letter set forth the relevant Plan language, but never specifically identified the kinds of evidence that could constitute Objective Medical Findings for any of Daie's conditions (AR at 482–92).

Daie filed a first-level appeal in March 2014, and Reed upheld the denial of benefits in June 2014. The letter related the types of Objective Medical Findings that each of the independent reviewers found lacking in Daie's records for each of his conditions and identified the evidence that tended to contradict his claim that he could not work (AR at 524–52).

8

### B. Final Appeal by CAFS.

Daie requested a final appeal of his application, which was reviewed by CAFS. CAFS submitted Daie's entire file to two additional independent reviewers, who both confirmed that Daie failed to provide Objective Medical Findings of his inability to work. CAFS also asked Daie to provide his claim files from the Social Security Administration and from Metlife on numerous occasions. Daie never provided those records (AR at 94–199, 138, 150, 158, 1855).

#### (1) Dr. Trangle (Physician).

Dr. Kevin Trangle reviewed Daie's file, including the review conducted by Reed, from a medical perspective. Reviewing Physician Trangle reviewed plaintiff's history of sinus surgeries and noted that he required brief breaks from work while recovering from those procedures, but that Surgeon Raines, released him to full-time work within two weeks. Physician Trangle also echoed the concerns that Daie had a history of noncompliance with treatment, which interfered with his control of his asthma symptoms. Reviewing Physician Trangle noted that Daie's lung capacity tests were consistent with the ability to perform light to moderate physical work, certainly allowing him to perform his sedentary work.

Reviewing Physician Trangle also noted that Daie briefly sought treatment for his sleep apnea, but that the medical records failed to indicate the status of his treatment efforts. In any case, Reviewing Physician Trangle concluded that no Objective Medical Findings indicated that Daie's sleep apnea would render him unable to work.

Imaging studies and thorough evaluations of Daie's musculoskeletal conditions also did not indicate an inability to work, but rather indicated normal results with the exception of some sensory loss and burning pain.

Reviewing Physician Trangle opined that Daie's self-reported cognitive impairment due to side effects from his medication never led to any neuropsychological testing, which would have been expected as an Objective Medical Finding of such impairment.

#### (2) Dr. Torem (Psychiatrist).

Dr. Moshe S. Torem reviewed Daie's file, including the review conducted by Reed, from a psychiatric perspective. Reviewing Psychiatrist Torem noted that disabling psychiatric

9

1 impairment generally requires psychiatric hospitalization and involves psychotic symptoms
2 such as hallucinations, delusions, or paranoia. Reviewing Psychiatrist Torem echoed the
3 findings of previous reviewers that Objective Medical Findings of cognitive impairment could
4 have been provided in the form of neuropsychological tests, but no tests were performed.
5 Reviewing Psychiatrist Torem also noted that Daie's physicians had left him responsible for his
6 own medical and psychiatric care, which indicated intact cognitive function.

*         *         *

CAFS affirmed Reed's denial of benefits in April 2015 (AR at 137–59). CAFS noted in particular that seven independent medical specialists reviewed Daie's file and "[a]ll independent medical specialists [were] unequivocal in their respective opinions, that there [were] no Objective Medical Findings showing that a medical condition or combinations of conditions preclude[d] [Daie] from performing the work of [his] own occupation as Server Memory and Security Technology Director" (AR at 156). CAFS expressly acknowledged that several of Daie's physicians had opined that he was disabled (AR at 157–58):

> We considered the opinions of Drs. Graham, Settles and Kelly [sic] who opined that your client's anxiety, depression and fatigue would likely prevent him from working, but note that these physicians did not support their conclusions with Objective Medical Findings that would substantiate that your client's mental health conditions, singularly or in combination with his physical ailments, precluded him from performing his own occupation. Further, the records document that when seen by treating psychiatrists, objective findings on mental status exams showed that thought and memory were within normal limits. When treated by other medical providers, he was noted to be awake, alert, fully oriented, and cognitively intact. No significant psychiatric symptoms or observations were described. Additionally, there was no indication that his mental state precluded him from engaging in his activities of daily living or that he required a higher level of case [sic] such as intensive outpatient or inpatient treatment, which would be anticipated with a disabling mental condition.

Accordingly, CAFS finally denied Daie's application for benefits under the Plan. Daie commenced this action in November 2015, contending that defendants improperly denied his claim for benefits. Both sides now move for summary judgment. This order follows full

10

briefing, including supplemental briefing relating to a recent decision from our court of appeals, and oral argument.[6]

**ANALYSIS**

Both sides agree that defendants' decisions are reviewed for an abuse of discretion and that "[t]he test for abuse of discretion in a factual determination (as opposed to legal error) is whether we are left with a definite and firm conviction that a mistake has been committed." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011). "To do so, we consider whether application of a correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Ibid.* Both sides further agree that neither Reed nor CAFS had any conflict of interest in administering the Plan, which was fully funded by Intel. Thus, review of the denial of Daie's claim is not subject to "special skepticism." *Id.* at 675. Nevertheless, "'[d]eference' is not a talismanic word that can avoid the process of judgment." *Ibid.*

Defendants do not dispute whether Daie indeed suffered from the conditions identified (Defs.' Reply at 7). Thus, the issue in this case is *not* whether Daie provided sufficient evidence of his *diagnoses*. Rather, the issue is that the Plan provided, "[b]oth the illness or injury, and the inability to perform work, must be substantiated by Objective Medical Findings" (Plan Doc. at 3). Defendants found that Daie failed to provide sufficient Objective Medical Findings (as defined by the plan) to support his *inability to work* at his own occupation. As stated, defendants' decision may only be overturned if it was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *Salomaa*, 642 F.3d at 676.

Both Reed and CAFS engaged in extensive review of Daie's medical records. Many of the reviewing physicians identified objective evidence that conflicted with Daie's self-reported impairments. Moreover, each reviewing physician found that Daie's medical records lacked the

---

[6] Daie has also filed a separate lawsuit against the same defendants herein, alleging intentional infliction of emotional distress arising out of the processing of his disability claim. A previous identical case was filed in state court, removed to this Court, remanded, and dismissed from the state court for *forum non conveniens*. Rather than re-file the case in Arizona, as contemplated by the order dismissing that action, Daie filed the action in federal court in San Francisco. Defendants move to transfer that action to the District of Arizona and they separately move to dismiss. The parties are represented by the same counsel in both actions.

kind of Objective Medical Findings they would expect to find if his conditions in fact prevented him from working. Reed's and CAFS's letters to Daie specifically indicated which Objective Medical Findings had been lacking.

Daie does not point to any part of the record that he contends constitutes Objective Medical Findings of his inability to work. Instead, he recites evidence of his lengthy list of diagnosed conditions, identifies self-reported evidence of his inability to work, and ultimately relies on the fact that three of his physicians at some point indicated he could not work. None of Daie's arguments overcome defendants' reasonable conclusions that Daie failed to provide Objective Medical Findings that his medical conditions impaired his ability to work. Because the Plan provided that "[b]oth the illness or injury, and the inability to perform work, must be substantiated by Objective Medical Findings," defendants reasonably concluded, based on the absence of such findings, that Daie did not qualify for long-term benefits under the Plan (*see* Plan Doc. at 3).

Daie contends that our case is analogous to *Salomaa*, 642 F.3d 666, in which the plaintiff claimed disability due to chronic fatigue syndrome, which could not be diagnosed based on objective medical tests. The plan administrator therein, however, had a conflict of interest warranting a special degree of skepticism (absent here), inasmuch as the administrator also funded the plan. As here, the plan in *Salomaa* required disability claims to be supported by objective medical evidence as defined at length by the plan.

In *Salomaa*, the plaintiff's physicians advised the plan administrator that no objective evidence of her condition could exist, but the defendant denied the claim anyway. Our court of appeals held that the defendant improperly denied the plaintiff's claim because "conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious." *Id.* at 678. The defendant's abuse of discretion came into particularly sharp relief because the ground for denying the claim shifted at each level of review. Moreover, the defendant's denial letters recited "irrelevant medical mumbo jumbo" about objective medical evidence, without explaining what medical evidence the plaintiff could provide to satisfy the reviewer.

Unlike in *Salomaa*, here, Reed and CAFS provided Daie with lengthy descriptions of the specific categories of Objective Medical Findings it found lacking as evidence of disability for each of Daie's conditions. They further provided detailed descriptions of the contradictory evidence in his records. Reed and CAFS provided significantly more information than the cryptic "mumbo jumbo" of *Salomaa*. Moreover, Reed and CAFS maintained a consistent rationale for their denial at every level. Thus, *Salomaa* is distinguishable.

After the briefing on this motion had been completed, our court of appeals decided *Scoles v. Intel Corporation Long Term Disability Plan*, No. 13-36167, 2016 WL 4056402 (9th Cir. July 29, 2016), in which it applied *Salomaa* in addressing a claim for the recovery of benefits from the very same long-term Plan at issue here. In *Scoles*, the plaintiff left her position due to panic disorder, major depressive disorder, and generalized anxiety disorder. She qualified for benefits under Social Security, and upon a first-level appeal, she qualified for benefits through the eighteen-month "own occupation" period of the Plan (which, as stated, required proof of inability to work at her own position). The Plan discontinued the plaintiff's benefits once she reached the "any occupation" period (which, as stated, required proof of inability to work at any position). *Id.* at *2.

In its letter denying the plaintiff her benefits for the "any occupation" period, Reed acknowledged her documented diagnoses but stated that the record lacked Objective Medical Findings to support the finding that she could not work in "any occupation," even though nothing in the record supported a different conclusion for the different standards. The letter contained a brief perfunctory section labeled "Assessment/Rationale," but that section gave no guidance on the meaning of Objective Medical Findings in the mental-health context beyond a recitation of the Plan's definition. It also failed to explain how the plaintiff's records constituted Objective Medical Findings under the "own occupation" standard but not under the "any occupation standard." Finally, Reed failed to explain why the plaintiff qualified under Social Security but not under the Plan. *Ibid.*

Only in the letter from CAFS notifying the plaintiff of her final denial did the plaintiff receive any information about the kinds of evidence she would need to submit to support her

13

claim, but even that explanation was deficient. "In any event, any clarity provided by CAFS came too late, as CAFS was the final administrative reviewer and [the plaintiff] lacked further opportunities to submit new medical evidence." *Id.* at *3.

Because Reed failed to engage in a "meaningful dialogue" with the plaintiff and instead provided a perfunctory denial-of-benefits letter that shed "little light on how to prove disability on account of a mental-health condition," our court of appeals held that Reed and CAFS abused their discretion in denying her claim for benefits. *Id.* at *4.

The Court invited supplemental briefing addressing *Scoles*. In his supplemental brief, Daie asserts that the denial-of-benefits letters in *Scoles* were "similarly worded" (Pl.'s Supp. Brief at 4, 5). Daie's unfounded statement is incorrect. The Court has reviewed the denial-of-benefits letters in *Scoles*, and those letters did *not* identify the kinds of testing that would be expected to show objective medical findings. Rather, the defendants therein merely identified aspects of the administrative record that had been poorly-developed, stating "goals and focus of therapy were not clearly defined" and that there were "no clearly defined and observed acute symptoms or clinical manifestations . . . ." *Scoles*, Case No. 13-36167, ER at 367.

Unlike in *Scoles*, defendants herein provided Daie with extensive information about the kinds of objective evidence that would prove his disability for each of his conditions, *including* his mental-health conditions. The "Clinical Judgment or Rationale" section of Reed's letter to Daie spanned five pages and summarized in comprehensible wording each reviewing physician's report (as compared to the section of less than one page in *Scoles*). Notably, the letter to Daie identified the kinds of Objective Medical Findings that would be expected if Daie's conditions were in fact disabling. For example, Reed indicated that Daie failed to provide "a complete pulmonary function test," that there had been no "abnormal behavioral findings" or "mental status examination abnormalities," and that evaluations showed "good objective function" despite his musculoskeletal conditions (AR at 533–37). Further, defendants acknowledged Daie's Social Security and Metlife benefits. Indeed, CAFS requested that Daie provide the files from those applications so it could engage with Daie's claims more thoroughly, but Daie failed to provide the requested information. Our defendants nevertheless described the

different standards applied by the different entities, explaining why the Plan reached a different conclusion as best as possible without the details of Daie's submissions to the Social Security Administration or to Metlife (AR at 537–38).

Moreover, unlike in *Scoles*, our defendants did not rely solely on an assertion of a lack of Objective Medical Findings in the face of evidence that had previously satisfied its requirements. Rather, they identified evidence in Daie's medical records tending to contradict his claim that he could not work. For example, despite Daie's self-reported cognitive impairment, several physicians reported that he was alert and intact. Similarly, contrary to Daie's contention that he suffered debilitating pain due to his musculoskeletal conditions, several physicians reported that his range of motion and gait were normal and even noted that he self-reported moderate pain levels.

At oral argument, claimant's attorney, Eric Whitehead, asserted that the letters in *Scoles* and the letters here were "practically identical" and that "it's a cut and paste" (Tr. at 4–5). Because Attorney Whitehead's representation conflicted with the Court's understanding of the differences between the denial letters, the Court asked Attorney Whitehead to provide examples of sections in the letter sent to Daie that constituted what he described as "literally a cut and paste of the Plan provisions" (Tr. at 5). Attorney Whitehead first pointed to the opening pages of the letter sent to Daie, which indeed recited the Plan provisions, but counsel for defendants then stated the remaining pages contained "individual analysis of Mr. Daie's — Mr. Daie's conditions. There was no individualized analysis of Ms. Scoles' conditions in that letter" (Tr. at 7–8).

Attorney Whitehead then described that latter section as "a cut-and-paste job from the physician consultants' reports that are not in layman's terms" (Tr. at 8). The Court asked Attorney Whitehead to point to the pages in the record that had been cut and pasted into the letter sent to Daie, to which he stated, "I do not have the exact pages" (*ibid.*). A ten-minute recess was taken to afford Attorney Whitehead the opportunity to substantiate his representations.

15

Upon resuming oral argument, the Court read the first paragraph of the "Clinical Judgment or Rationale" section of the letter sent to Daie as follows (AR at 533):

> The information submitted by Mr. Daie on his behalf does not meet the requirements of Objective Medical Findings as defined in section 2.10 of the LTD plan.

Rather than point to language from which that passage had been copied, Attorney Whitehead stated "well, that's a conclusory statement" but pivoted and stated it had been copied from the Plan Documents (Tr. at 10). When asked to point to that language in the Plan, Attorney Whitehead again changed positions, contending the language had been copied from Allergist Gupta's report. Attorney Whitehead read the following passage (AR at 187):

> In summary, based on the information provided for allergist/immunologist perspective only, there is no objective evidence to support physical functional limitations.

Plainly, that excerpt from Reviewing Allergist Gupta's section was not copied and pasted in Reed's letter to Daie. The Court moved on to the substantive contents of the letter and again asked Attorney Whitehead to point to copied language, and he responded that *Scoles* held that Reed "cannot simply list in the denial letter the definitions of the Plan, what documents are in the administrative record, and make a conclusory statement that plaintiff did not meet that standard" (Tr. at 12). The Court read a paragraph from the summary of Allergist Gupta's review (AR at 533):

> According to Mr. Daie's Primary Care Physician and Psychiatrist, the claimant has been unable to work due to poor cognitive functioning secondary to chronic oral steroid use from severe persistent asthma.

Attorney Whitehead averred that excerpt had been copied from page 187 of the administrative record and read the following passage (AR at 187):

> The Claimant is a 56-year-old male with a history of persistent asthma, allergic rhinitis, aspirin-induced respiratory disease, status post desensitization, chronic sinusitis, nasal polyps, status post surgery.

Again, the passages were plainly not identical, not even close, although they, of course, covered much of the same subject matter. Attorney Whitehead tried to slide off the "cut and paste" line and invoked the "medical mumbo jumbo" prohibition in *Salomaa*.

16

The Court acknowledges that some latitude must be permitted for zealous advocacy, but Attorney Whitehead's conduct was not mere zealous advocacy. It was blatant misrepresentation. Indeed, beyond his conduct at oral argument, his brief on this motion was rife with exaggerations, inaccuracies, misrepresentations, and statements of fact with no support in the record.

In any case, Attorney Whitehead's argument ignores the fact that the denial letter sent to Daie provided significantly more detail than that in *Scoles* and provided actual analysis of the findings of the reviewing physicians. In fact, the letter simplified much of the so-called mumbo jumbo in a manner that would indicate to Daie the kinds of evidence needed to support his disability. (Certain medical terms, of course, must be used in order to describe medical conditions.) Daie's frustration with his inability to satisfy defendants' demands for Objective Medical Findings simply follows from the fact that he *can* continue to perform his own occupation, or so defendants reasonably concluded.

Daie has failed to carry his burden to show that defendants' denial of his claims was illogical, implausible, or unsupported by inferences from the record. Thus, in light of the deferential standard all agree applies in this case, defendants are entitled to summary judgment.

## CONCLUSION

To the extent stated above, summary judgment for defendants is **GRANTED**, and plaintiff's motion for summary judgment is **DENIED**. Final judgment will follow.

**IT IS SO ORDERED.**

Dated: August 10, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

17